. WhitakeR, Judge,
delivered the opinion of the court:
Plaintiff in these actions, Pacific Maritime Association, is a California non-profit corporation. It is seeking to recover compensation for services rendered by its predecessor corporations to the United States Army in connection with the Army’s direct hiring of longshoremen at the San Francisco Port of. Embarkation during the period January 1, 1942, through July 15,1946.
*670 The petition in case No. 48895 was filed on October 25,1948, by the Waterfront Employers Association of the- Pacific Coast. The petition in case No. 49003 was filed on behalf of the Waterfront Employers Association of the Pacific Coast and its agent, the Waterfront Employers Association of California[1] on January 27, 1949. Subsequent to the filing of these petitions, the two Associations were consolidated to form the Pacific Maritime Association, whereupon amended petitions were filed setting forth the consolidation and the substitution of parties plaintiff. Both petitions were based upon the same claim, were consolidated for trial under Buie 38 (a) of this court, and have been treated as one case throughout these proceedings.
The suits are for compensation for furnishing the Army longshoremen to load and unload cargo. Under the terms of contracts between plaintiff or its predecessors and unions representing the longshoremen,[2] a central dispatching hall was organized in each of the West Coast ports, including San Francisco, to conduct the daily hiring and dispatching of longshoremen' to employers requiring their services. One-half of the operating expenses of the dispatching halls were paid by the Association and the other half by the Union. A labor pool or registration list of the longshoremen was also established in each port to provide a means of equitably distributing the available work among the longshoremen. The contracts further provided that the Association and the Union should each have an equal voice in the maintenance of the registration list and in the operation of the dispatching halls.
The Association, acting on behalf of its members and certain non-members permitted to obtain longshoremen through the dispatching halls, handled all of the administrative, labor relations, and personnel work, and all of the other employer functions involved in the operation of the labor pools and dispatching halls in each of the ports. In *671 order to carry out these functions, the Association during the period here in question charged employers who received its services 2% cents per manifest ton of general cargo if they were members of the Association. In the case of nonmember employers permitted to use the dispatching halls, the Association’s charge was 4 cents per longshore man-hour. From the funds thus received, the Association performed the following services in addition to maintaining and administering the labor pools and dispatching halls: (1) It negotiated and obtained the necessary legal assistance for negotiating the amendments and the renewals of the longshore contracts providing for the continued operations of the labor pools and dispatching halls and fixing the wages, hours, and working conditions under which the services of longshoremen were made available through the halls; (2) At its sole expense it performed all of the accounting and bookkeeping involved in the operation of the halls; (3) It conducted the recruitment and screening of new men necessary to maintain the registration lists at full strength; . (4) During World War II it supervised the removal of alien longshoremen excluded from the waterfront area by Government regulation,, provided the necessary identification and fingerprinting for the remaining longshoremen, and obtained occupational deferments from the Selective Service of key workers; (5) It organized the registration list to provide various kinds of gangs, extra men, and key personnel, and during World War II furnished special registration cards to men qualified to handle ammunition and high explosives, and supervised the integration of new and untrained men with experienced longshoremen so as to have a trained nucleus in each gang; (6) It conducted an intensive safety and accident prevention program ; (7) It handled grievances and the disciplining of men for misconduct; and (8) It handled during the war an allocation program designed to obtain the most advantageous and equitable use of the available longshoremen.
Prior to 1942 the Army, acting through its subdivision, the San Francisco Port of Embarkation, performed its own stevedoring in the San Francisco Bay area by means of registered longshoremen obtained from the dispatching halls. Although the Army used plaintiff’s services in securing these *672 longshoremen, no effort was made by plaintiff to recover compensation for these services, because at this time the Army’s use constituted only a minor portion of plaintiff’s business. However, during 1941, the Army’s use of plaintiff’s services and facilities was greatly enlarged due to the increase in the movement of Army cargoes to Pacific bases. Specifically, the employment of longshoremen by the Army increased from approximately 38,000 man-hours in January 1941 to approximately 180,000 man-hours in December 1941. As a result of this increased use, plaintiff’s president in December 1941 submitted an oral request to the Water Transportation Branch of the Office of the Quartermaster General that the Army pay for the services it was receiving from the Association. Plaintiff’s president was advised that hi s request would be referred to higher authority with a recommendation favoring payment, but that plaintiff should submit its request in writing.
Accordingly, plaintiff’s president on December 20, 1941, and again on January 26, 1942, wrote letters to the Office of the Quartermaster General requesting payment at the same rate paid by members of the Association. Charges to members were on a tonnage basis, but plaintiff’s president advised the Army that if it was unwilling to divulge the cargo tonnage passing through the San Francisco port, the Association would be willing to accept, in lieu of the 2y2 cents per ton paid by its members, an equivalent rate of 2y2 cents per longshore man-hour. These letters were forwarded by the Army in Washington to the Army Transport Service for the San Francisco Port of Embarkation with instructions to investigate the matter, which resulted in numerous conferences being held in San Francisco between representatives of the Army and of plaintiff concerning the nature, extent, and volume of the services rendered to the Army Transport Service.
In April 1942, while plaintiff’s proposal was under consideration, a reorganization took place within the Army, and the Chief of Transportation assumed the functions formerly. performed by the Quartermaster General, including the negotiations with plaintiff. On June 10, 1942, a com *673 mittee of the Board of Directors of the Association wrote to Colonel Mellom, Superintendent of the Army Transport Service at San Francisco, renewing the request that the Army share in the expense of maintaining the Association’s services. This letter pointed out that such a considerable portion of longshore labor was being used directly by the Army, that contributions from other members of the Association were proving insufficient to meet its running expenses, and concluded by asking that the Army contribute to the expense of the service in the amount of 1.7 cents per man-hour. Following the receipt of this letter, Colonel Mellom on July 9, and July 22,1942, recommended to the Office of the Chief of Transportation that the Association should be compensated for the services rendered by it to the Army. These communications outlined the nature of the services rendered by the Association but, in view of the fact that some of the services performed by the Association to its regular members were not of particular advantage to the Army, they contained a recommendation that plaintiff be paid upon the basis of 1.7 cents per man-hour of stevedore labor performed, instead of the 2^/2 cents at first requested. Colonel Mellom’s communication also recommended that payment should be effective as of January 1,1942, as the Army had assumed the major portion of the operations at the port of San Francisco during the latter part of December 1941.
Consideration of plaintiff’s request and of Colonel Mel-lom’s recommendations by the Office of the Chief of Transportation continued until September 25,1942, when the Chief of Transportation wired Colonel Mellom that a decision had been made to compensate plaintiff, but that the basis for compensation had not been formulated. Colonel Mellom was instructed not to take any action until receipt of further notice. Thereafter, on November 11, 1942, the Office of the Chief of Transportation advised Colonel Mellom’s assistant that payment of 1.7 cents per man-hour, commencing as of January 1,1942, had been approved, and that the necessary contracts should be prepared, but that the details thereof were to be subject to the approval of the Chief of Transportation. This information was immediately relayed to officials of the Association.
*674 Following the receipt of this information two contracts were drafted by the Army, one covering the period from January 1, 1942, to June 30, 1942, inclusive, and the other covering the fiscal year commencing July 1, 1942. These contracts provided for monthly payments by the Army at the rate of 1.7 cents per man-hour, but also stated that they were not binding until approved in writing by the Chief of Transportation. Plaintiff executed these contracts on December 26, 1942, whereupon they were forwarded to the Chief of Transportation for approval. This office took no action toward approving or disapproving these contracts.
Throughout the year 1943 plaintiff’s president held numerous conferences with officers in the Office of the Chief of Transportation in an effort to expedite payment for its services. Plaintiff’s president was told by the Army’s representatives that they had recommended payment and they expected that the Association would be paid, but that the matter had been sent “upstairs” and still remained there. Further conferences were held between officials of the Army and plaintiff’s president throughout 1944, and thereafter, but these efforts were without success. Meanwhile, the Army’s employment of longshoremen at San Francisco continued to increase until it reached a peak of over 500,000 longshore man-hours per month in March, April, May, and June 1945, which represented approximately 50 percent of the total work performed by longshoremen dispatched through the San Francisco dispatching hall. The Army thus became the largest single employer utilizing the Association’s services.
On April 16, 1947, the Association filed a claim with the Army under Section 17 of the Contract Settlement Act of 1944, 58 Stat. 649, 665, 41 TJ. S. C. § 117, to recover the sum of $410,332.80, which represented a rate of 2% cents per man-hour for the period from January 1, 1942, to July 15, 1946, inclusive. On January 5,1949, an Army Board of Inquiry issued findings of fact rejecting plaintiff’s claim upon several grounds, but primarily upon the ground that no officials of the San Francisco Port of Embarkation having authority to do so had promised payment or requested the Association’s services under such circumstances as to imply a promise to pay.
*675 Plaintiff says that the facts related above are sufficient to give rise to an implied contractual obligation by the Army to pay for the services furnished it by the Association, Plaintiff urges that the continuous acceptance by the Government of its services with knowledge that plaintiff expected to be paid, and without ever disclaiming an intention to pay, justified it in assuming an intention to pay. Since the Army received substantially the same services as its members, the Association maintains that it is entitled to receive compensation at the rate of 2y2 cents per man-hour, which it says is substantially equivalent to the rate of 2y2 ■cents per manifest ton paid by members. In the alternative, plaintiff argues that it is entitled to recover on the basis •of an informal contract under Section 17 of the Contract Settlement Act, sufra.
Although defendant admits that the Association demanded payment for its services, it argues that they were supplied under circumstances which negative the existence of an implied contract. Those circumstances according to defendant were (1) the fact that plaintiff was at all times advised that ■any agreement with respect to compensation would have to he approved by the Chief of Transportation, and (2) the fact that approval of the several drafts of contracts was never actually obtained. Defendant also insists that many ■of the services which the Association performed on behalf of its members did not inure to the Army’s benefit, and consequently the Association was wrong in requesting the Army to pay compensation at the same rate paid by members of the Association.
While it cannot be said that the parties entered into an express contract in the instant case, we are of the opinion that an undertaking to compensate the Association for the fair and reasonable value of its services furnished after its •demand for payment may be fairly implied in fact from all of the circumstances, especially the fact of the Army’s continued use of such services subsequent to that demand. Clark v. United States, 95 U. S. 589, 542; Niagara Falls Bridge Commission v. United States, 111 C. Cls. 838; Buffalo & Fort Erie Public Bridge Authority v. United States, 106 C. *676 Cls. 731; National Carloading Corp. v. United States, 105 C. Cls. 479.
The Army at no time disclaimed an intent to pay plaintiff. Rather it continued to demand and accept plaintiff’s services and to negotiate with plaintiff in the expectation of making an express contract for payment. Despite defendant’s present contention, it recognized the validity of plaintiff’s claim for payment for those services, and finally on November 11, 1942, acknowledged to plaintiff its obligation to pay compensation at the rate of 1.7 cents per man-hour from January 1, 1942. This amount was acceptable to plaintiff.
A contract was drawn by the San Francisco branch of the Army Transport Service providing for the payment of this amount, and containing other terms and conditions. It was signed by plaintiff, but never was executed by the headquarters of the Army Transport Service.
Thus no express contract was entered into, but the Army continued to request and to receive plaintiff’s services. From this it follows that an implied contract arose to pay reasonable compensation. Cases cited supra.
The situation presented by this case is in many respects similar to a case other than those cited supra, the case of Tidewater Coal Exchange v. United States, 67 C. Cls. 590, from the opinion in which ato quote below. In that case the Government availed itself of the services of a non-profit corporation organized for the purpose of dispatching cargoes of coal at tidewater points. At first the Government paid for these services, but when it discontinued payment, plaintiff sued to recover the reasonable value of its services. In permitting plaintiff to recover, we made the following statement, at page 600, which we believe is equally applicable to the facts in this case:
* * * What is here involved is not an executory but an executed contract, i. e., the defendant has received the full benefit of all the advantages and savings access to the exchange affords, and refused to pay in full for what said services are reasonably worth. It is neither asserted nor contended that the defendant accepted the service as gratuitous, or under circumstances justifying such an inference, for payment was made without question over a long period of time. Starting with the case *677 of Clark v. United States, 95 U. S. 539, and consistently followed since, this court and the Supreme Court have adhered to the rule that a parole contract fully executed by the contractor upon his part, wherein the United States receives all the benefits of the undertaking, imposes a liability upon the latter as upon an implied contract. St. Louis Hay & Grain Co. v. United States, 191 U. S. 159; United States v. Bethlehem Steel Co., 258 U. S. 321; Andrews case, 41 C. Cls. 48; Moran Bros. v. United States, 39 C. Cls. 486.
The next question is, what is fair compensation. No better answer to this can be given than what the parties agreed upon, to wit, 1.7 cents per man-hour.
Defendant contends that inasmuch as plaintiff did not file its initial petition in this action until October 25, 1948, the recovery by plaintiff for any services rendered to the Army prior to October 25, 1942, is barred by this court’s statute of limitations, 28 U. S. C. (Supp. V) § 2501. We think this is correct.
Plaintiff first demanded compensation in December 1941; but, while subordinates in the Army Transport Service acknowledged the justice of plaintiff’s request, it was not until September 25, 1942, that the Chief of Transportation acknowledged liability, which was followed by an agreement on November 11, 1942, on the amount of 1.7 cents. The implied contract to pay reasonable compensation arose not later than September 25, 1942. Hence, plaintiff is entitled to recover for all services rendered since that time if within six years of the filing of the petition. The petition was filed on. October 25, 1948; and, hence, plaintiff clearly is entitled to recover for services rendered since that time. We think it is further entitled to recover for services during the month of October 1942.
It is clear from the evidence that the parties at all times during their negotiations contemplated a monthly system of payment. Such a provision had been incorporated in the contract drafted by the Army in December 1942. Moreover, during November 1943 plaintiff had been instructed to submit monthly bills for the period commencing January 1, 1942. Again, in December 1944, the tentative contract proposed by the Army provided for the payment of a fixed *678 monthly rate. Under such' circumstances, plaintiff’s claim for services rendered during the month of October 1942 did not accrue until October 31, 1942, when payment for the services could have been first demanded. Pennsylvania Coal and Coke Corporation v. United States, 108 C. Cls. 236, 248; Manufacturers Aircraft Association v. United States, 77 C. Cls. 481, 518, cert. den. 291 U. S. 667. We, therefore, hold that plaintiff’s claim for services rendered during the period from January 1 through September 30, 1942, inclusive, is barred by the statute of limitations, but that plaintiff is entitled to recover compensation at the rate of 1.7 cents per man-hour for the period October 1, 1942, through July 15, 1946. As the Army obtained 14,712,501 man-hours of longshore labor during this period, plaintiff is entitled to recover $250,112.52.
Defendant also argues that many of plaintiff’s functions were taken over during World War II by the Pacific Coast Maritime Industry Board which had been created by the War Shipping Administration on March 11, 1942. 46 C. F. It., Cum. Supp., § 304.1-7. While many of the purposes and functions for which this Board was established overlapped those which plaintiff performed for its members, the fact remains that the services for which compensation is here sought were sought from plaintiff and were performed by plaintiff rather than by this Board.
We do not think plaintiff is entitled to recover under the terms of the Contract Settlement Act, but rather under an implied contract. Judgment will be entered for plaintiff in the sum of $250,112.52.
Howell, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, as follows:
1. Case No. 48895 originally was instituted by Waterfront Employers Association of the Pacific Coast, a California nonprofit corporation, hereinafter called the “Coast Asso *679 ciation.” or the “Association.” Case No. 49003 was instituted by the Coast Association and by Waterfront Employers Association of California, also a California nonprofit corporation, sometimes hereinafter called the “California Association.” Subsequent to the filing of the petitions, the Coast Association and the California Association were consolidated to form Pacific Maritime Association, a California nonprofit corporation. By reason of the consolidation, Pacific Maritime Association succeeded by operation of law to all of the property, rights, claims, and choses in action of the Coast and the California Associations. The California Association itself had been formed November 1,1943, by the consolidation of Waterfront Employers Association of San Francisco and Waterfront Employers Association of Southern California, both California nonprofit corporations, and had, by operation of law, succeeded to all of the property, rights, claims, and choses in action of these two predecessor corporations.
2. On August 7, 1934, at the conclusion of a strike of Pacific Coast longshoremen, four organizations of steamship companies, stevedoring contractors and marine terminal operators doing business at California, Oregon, and Washington ports, entered into a collective bargaining contract (hereinafter called the “longshore contract”) with Pacific Coast District Local No. 38 of the International Longshoremen’s Association, AFL (hereinafter called the “ILA”), recognizing that Union as the exclusive collective bargaining ■representative of longshoremen employed by members of the four employer organizations and agreeing to arbitrate certain issues between the parties. These four employer organizations were Waterfront Employers of Seattle (later changed to “Waterfront Employers of Washington”), Waterfront Employers of Portland (later changed to “Waterfront Employers of Oregon and the Columbia River”), Waterfront Employers Association of San Francisco, and the Marine Service Bureau (later changed to “Waterfront Employers Association of Southern California”). An arbitration was had pursuant to provisions of said contract and resulted in an award providing for the establishment and maintenance of labor pools of longshoremen and for the establishment *680 and maintenance of central dispatching halls through which the longshoremen were to be dispatched as their services were required by members of the employer organizations. This award, by the terms of the contract above mentioned, became a part thereof. The contract was amended and renewed from time to time thereafter, through July 16,1946, and thereafter.
3. The longshore contract, as amended and renewed from time to time, provided for the establishment and maintenance in each of the ports covered thereby of a labor pool (registration list) of longshoremen and a central dispatching hall through which the longshoremen were to be dispatched to the several docks as their services were required from day to day. The contract provided that one-half of the expense of maintaining and operating the dispatching hall should be paid by the employer organization and the other half by the Union. The contract further provided that in each port the longshoremen comprising the labor pool were to be placed upon a registration list which was to be subject to expansion and contraction from time to time as the needs of the port might require. The employer organization and the Union were each to have an equal voice in the maintenance of the registration list and in the maintenance and operation of the dispatching hall, and were to act in respect to these matters through a so-called Port Labor Eelations Committee comprised of representatives of the two sides. The contract further provided that all grievances and disputes should be adjusted through the labor relations committees. Prior to a contract amendment and renewal executed under date of December 20,1940, if the employer and union representatives could not agree in a Port Labor Eela-tions Committee upon any matter in dispute, then such matter was to be referred to arbitration. The contract of December 20,1940, in addition to providing for Port Labor Ee-lations Committees, provided for a “Coast Labor Eelations Committee.” Under that contract, if the employer and union representatives could not agree upon any matter in dispute in a Port Labor Eelations Committee, then such matter was not referable immediately to arbitration, but was referable instead to the Coast Labor Eelations Committee, *681 and was referable to arbitration only if the employer and union representatives on the Coast Labor Eelations Committee could not agree.
A similar system of employment, including tbe maintenance of common labor pools and dispatching halls, was established for ship clerks in the San Francisco Bay area as set forth in a contract executed under date of November 8, 1941.
4. Prior to June 22, 1937, the various employer functions involved in maintaining said labor pools and dispatching halls in the four port areas were performed by the four employer organizations hereinabove mentioned. On June 22, 1937, the members of the four port employer organizations caused the Coast Association to be incorporated, and the Coast Association thereafter performed the various functions involved in the maintenance of the labor pools and dispatching halls which had theretofore been performed by the port organizations, and the port organizations thereafter acted merely as agents of the Coast Association and at Coast Association expense.
In 1937, Pacific Coast longshoremen, with the exception of those in the ports of Tacoma, Port Angeles and Anacortes, changed their affiliation from the ILA to the International Longshoremen and Warehousemen’s Union, District No 1, CIO (hereinafter called the “ILWU”), and on June 21,1938, the National Labor Eelations Board certified the ILWU as the exclusive collective bargaining representative of all longshoremen employed at ports in California, Oregon, and Washington by members of the employer organizations here-inabove mentioned. Thereafter, the ILWU also was recognized as the exclusive collective bargaining representative of ship clerks in the San Francisco Bay area.
Subsequent amendments and renewals of the longshore contract mentioned were negotiated and executed by the Coast Association on behalf of the employers and by the ILWU as the collective bargaining representative of the longshoremen, and subsequent amendments and renewals of the San Francisco clerks’ contract were negotiated and executed by Waterfront Employers Association of San Francisco and by its successor, Waterfront Employers Association *682 of California (acting as agents of the Coast Association), on bebalf of the employers and by the said ILWU as the collective bargaining representative of the marine clerks.
5. The October 1934 award of the National Longshoremen’s Board was extended and amended by agreement and by the interpretations of arbitrators in awards thereunder. Following the formation and incorporation of Waterfront Employers Association of the Pacific Coast, the Coast Association acted on behalf of and represented its employer members in connection with the amendments, agreements, and arbitra-tions affecting the award. Following the National Labor Relations Board’s certification of the ILWU as the bargaining agent of longshoremen employed at Pacific Coast ports by members of the employers’ associations (who had formed and were members of the employers’ Coast Association), the longshoremen were represented by the ILWU throughout the amendments, awards, and agreements.
Throughout all amendments, renewals, and arbitrator’s awards, the basic provisions of the 1934 award of the National Longshoremen’s Board relative to the joint hiring halls and the joint Labor Relations Committee were retained. The December 20,1940, agreement amending the 1934 award provided for the creation and operation of a joint Coast Labor Relations Committee, in addition to the various Port Labor Relations Committees, and for the operation of the hiring halls, the labor relations committees and handling of grievances and disputes in accordance with the terms of the modified award and agreement.
As modified by the terms of the December 1940 amendment, the pertinent provisions of the award and agreement provided as follows:
Section 1¡,. The hiring of all longshoremen shall be through halls maintained and operated jointly by the International Longshoremen’s and Warehousemen’s Union, Pacific Coast District Number One, and the respective employers’ associations. The hiring and dispatching of all longshoremen shall be done through one central hiring hall in each of the ports of Seattle, Portland, San Francisco, and Los Angeles, with such branch halls as the Labor Relations Committee, provided for in Section 9, shall decide. All expense of the hiring halls shall be borne one-half by the International Long *683 shoremen’s and Warehousemen’s Union and one-half by the employers. Each longshoreman registered at any hiring hall who is not a member of the International Longshoremen’s and Warehousemen’s Union shall pay to the Labor Eelations Committee toward the support of the hall a sum equal to the pro rata share of the expense of the support of the hall paid by each member of the International Longshoremen’s and Warehousemen’s Union.
/Section 5. The personnel for each hiring hall shall be determined and appointed by the Labor Eelations Committee for the port, except that the dispatcher shall be selected by the International Longshoremen’s and Warehousemen’s Union.
Section 6. Preference of employment shall be given to members of Pacific Coast District International Longshoremen’s and Warehousemen’s Union whenever available. This section shall not deprive the employers’ members of the Labor Eelations Committee of the right to object to unsatisfactory men (giving reasons therefor) in making additions to the registration list, and shall not interfere with the making of appropriate dispatching rules.
* $ $ * $
Section 8. The hiring and dispatching of longshoremen in all ports covered by this award other than those mentioned in Section 4, and excepting Tacoma, shall be done as provided for the ports mentioned in Section 4; unless the Labor Eelations Committee in any of such ports establishes other methods of hiring or dispatching.
Section 9. The parties shall immediately establish and maintain during the existence of this agreement a Coast Labor Eelations Committee of six members, three to be designated by the employers and three by the union. There shall also be established and maintained throughout the existence of this agreement a Port Labor Eelations Committee for each port affected by this agreement, composed of three representatives designated by the employers’ association of the port and three to be designated by the local union. By mutual consent any Labor Eelations Committee may change the number of representatives of the respective parties. Any Coast or Port Labor Eelations Committee shall meet promptly at the request of either party.
The Coast Labor Eelations Committee shall have power and jurisdiction to determine any question involving the interpretation of this agreement and to decide any dispute arising thereunder. The Coast *684 Labor Relations Committee shall have power to set aside any decision or other action of any Port Labor Relations Committee and shall have the power and duty to establish uniform coast working and dispatching rules for any or all of the ports affected hereby and to interpret and apply the same.
The parties shall endeavor to agree upon a Coast Arbitrator ; if they cannot so agree, the Secretary of Labor or any person authorized by the Secretary shall, at the request of either party, appoint one Coast Arbitrator. Before making such appointment, the Secretary of Labor shall be requested to confer with the parties. If the Coast Arbitrator shall at any time be unable or refuse or fail to act or shall resign, then at the request of either party the Secretary of Labor shall promptly appoint his successor or substitute.
The parties, or, at the request of either of them, the Coast Arbitrator, shall select Arbitrator’s Agents, one for each of the four districts of Puget Sound, Columbia River, Northern California and Southern California. All expenses of the Coast Arbitrator and of the Arbitrator’s Agents and their respective compensations or salaries shall be equally borne by the parties. Each of the Arbitrator’s Agents shall at all times function under and in accordance with the decisions and directions of the Coast Arbitrator. Both the Coast Arbitrator and the Arbitrator’s Agents shall at all times be available for the performance of their respective functions and duties under the provisions of this agreement.
In the event that any Port Labor Relations Committee shall fail to agree on any question before it, it shall be immediately referred at the request of either party to the Coast Labor Relations Committee for decision. In the event that the Coast Labor Relations Committee fails to agree on any question involving the interpretation of this agreement or any dispute arising hereunder, or upon any other question of mutual concern not covered by this contract and relating to the industry, such question shall, at the request of either party, be referred to the Coast Arbitrator for decision.
The Coast Arbitrator shall have power to hear and determine any complaint of either party concerning alleged violations of the provisions of this agreement and shall have power to finally and conclusively determine the same.
All meetings of the Coast Labor Relations Committee and all arbitration proceedings before the Coast Arbitrator shall be held in the City and County of San Fran *685 cisco, State of California, unless the parties shall otherwise stipulate in writing. All decisions of the Coast Arbitrator shall be given in duplicate and shall be in writing signed by the Arbitrator and shall be delivered to the respective parties.
Nothing in this section shall prevent the parties from agreeing upon other means of deciding matters upon which there has been disagreement.
The Coast Arbitrator shall have power to delegate to the Arbitrator’s Agents the power to hear and determine disputes arising under the contract of a local significance or character, and in such case the action of the Coast Arbitrator in delegating such authority shall be conclusive upon all parties. Arbitration proceedings before any Arbitrator’s Agent shall be conducted in the same manner as proceedings before the Coast Arbitrator.
All decisions of the Coast Arbitrator_and of the Arbitrator’s Agents shall be final and binding upon all parties.
Section 10. Subject to the control and direction of the Coast Labor Relations Committee, the duties of the Port Labor Relations Committee shall be:
(al To maintain and operate the hiring hall;
(b) To have complete control of the registration list of the regular Longshoremen of the Port including the power to make such additional registrations of the longshoremen as may be necessary; no longshoremen not on such a list shall be dispatched from the hiring hall or employed by any employer while there is any man on the registered list qualified, ready, and willing to do the work;
(c) To decide questions regarding rotation of gangs and extra men; revision of existing lists of extra men and of casuals; and the addition of new men to the industry when needed;
(d) To investigate and adjudicate all grievances and disputes relating to working agreements;
(e) To decide all grievances relating to discharges. The hearing and investigation of grievances relating to discharges shall be given preference over all other business before the Committee. In case of discharge without sufficient cause, the Committee may order payment for lost time or reinstatement with or without payment for lost time;
(f) To decide any other question of mutual concern relating to the industry and not covered by this agreement.

*686
Section 11.

(a) Subject to the control and direction of the Coast Labor delations Committee, the Labor Relations Committee for each port shall determine the organization of gangs and methods of dispatching. Subject to this provision and to the limitations of hours fixed in this agreement, the employers shall have the right to have dispatched to them, when available, the gangs in their opinion best qualified to do their work. Subject to the foregoing provisions gangs and men not assigned to gangs shall be so dispatched as to equalize their work opportunities as nearly as practicable, having regard to their qualifications for the work they are required to do. The Employers shall be free to select their men within those eligible under the policies jointly determined, and the men likewise shall be free to select their jobs.
*****
(c) The Employers shall have the right to discharge any man for incompetence, insubordination, or failure to perform the work as required in conformance with the provisions of this agreement. If any man feels that he has been unjustly discharged or dealt with, his grievance shall be taken up as provided in Section 10.
sje %
(e) All members of the Union shall perform their work conscientiously and with sobriety and with due regard to their own interests shall not disregard the interests of their employers. Any member of the Union who is guilty of deliberate bad conduct in connection with his work as a longshoreman or through illegal stoppage of work shall cause the delay of any vessel shall be fined, suspended or for deliberate repeated offences expelled from the Union. Any employer may file with the Union a complaint against any member of the Union, and the Union shall act thereon and notify the Labor Relations Committee of its decision within ten (10) days from the date of receipt of the complaint.
After the expiration of ninety (90) days from this date, if the employers are dissatisfied with the disciplinary action taken under the foregoing paragraph, then the following independent procedure may be followed:
The Port Labor Relations Committee shall have the power and duty to impose penalties on longshoremen who will be found guilty of stoppages of work, refusal to work cargo in accordance with the provisions of this agreement, or shall leave the job before relief is provided, or who shall be found guilty of pilfering or *687 broaching cargo, or be found guilty of drunkenness, or shall in any other manner violate the provisions of this agreement or any award or decision of an arbitrator or arbitrator’s agents. If any Port Labor Relations Committee shall fail to agree upon the imposition of a penalty, or the adequacy thereof, the matter shall then go before the Coast Labor Relations Committee, and if it cannot agree, the Coast Arbitrator for decision.
(f) Promptly on the execution of this agreement, the Coast Labor Relations Committee shall establish basic Coast standard dispatching, and working rules as far as practicable; in the event that the Committee is unable to agree upon any of the matters set forth in this section, the matter shall be referred to the Coast Arbitrator for decision, at the request of either party. All local port dispatching, working and safety rules in effect at this time shall continue in effect until changed or superseded in accordance with the terms of this agreement.
(g) The employers shall provide safe gear and safe working conditions. A safety code for longshore work shall be negotiated by the parties and if they shall not agree, it shall be arbitrated only by mutual consent.
# ifc if: ‡ *
6. From the time of its incorporation in 1937 until the formation of the Pacific Maritime Association in 1949, the Coast Association, on behalf of its members and other employers obtaining longshoremen and clerks through the dispatching halls, performed all of the administrative, labor relations and personnel work, and all of the other employer functions, involved in maintaining and operating the longshoremen’s and clerks’ labor pools and dispatching halls in the San Francisco Bay area, as well as at other Pacific Coast ports. The various functions performed by the Coast Association in thus maintaining and operating the San Francisco labor pools and dispatching halls were all directed to the end of making longshoremen and clerks available to the employers through the dispatching halls as needed. These functions, which are more particularly hereinafter described, included the negotiation of amendments and renewals of the longshore and clerks’ contracts providing for the continued maintenance and operation of the registration lists and dispatching halls and fixing the wages, hours and working conditions at which the services of the longshoremen and clerks were to be available through the halls; administration of the dispatch *688 ing halls, including the allocating of gangs among the several employers,’ performance, at its sole expense, of all of the accounting and bookkeeping involved in the operation of the halls, and payment of one-half of all of the other operating expenses; recruitment and screening of new men, organization of the registered list to provide various kinds of gangs, extra men and key personnel; and the handling of grievances, and the imposition of discipline for misconduct. The Association also did certain safety or accident prevention work.
For the rendition of the foregoing service, the Association charged employers using the dispatching halls certain fees. In the case of members of the Association, the charge was 2y2 cents per manifest ton of general cargo, until about July 1946, when the rate was raised to 5 cents per manifest ton. In the case of non-member employers permitted to use the dispatching halls, the charge was 2% cents per man-hour for longshoremen until 1940 when it was raised to 4 cents per man-hour, and was %y2 cents per man-hour for clerks.
7. During the times hereinafter mentioned, at Pacific Coast ports other than San Francisco, stevedoring on ships operated by the Army was done by stevedoring contractors who were members of the Coast Association and paid the Association its tonnage charges on all tonnage handled for the Army. However, in the San Francisco Bay area during the period from January 1, 1942, to July 16, 1946, and immediately prior thereto, the Army, acting through a subdivision known as the San Francisco Port of Embarkation, did almost all of its own stevedoring. F or that purpose it employed registered longshoremen and clerks in the San Francisco Bay area dispatching halls and thus availed itself of the Association’s service described in finding 6 above. Prior to the year 1941, the Army’s employment of registered longshoremen and clerks at San Francisco was not substantial, but in 1941, as the movement of Army cargoes to the Pacific developed and increased, the Army’s use of the dispatching halls likewise increased. Thus, the Army’s employment of longshoremen increased from approximately 38,000 man-hours in January 1941, to approximately 180,000 man-hours in December 1941. The Army’s employment of registered *689 longshoremen and clerks in the San Francisco Bay area continued to increase during the war years until it reached a peak of over 500,000 longshore man-hours per month in March, April, May, and June 1945, at which time the Army work represented approximately 50 percent of the total work performed by registered longshoremen dispatched through the San Francisco dispatching hall, and the Army was by far the largest single employer utilizing the hall and the pool of registered longshoremen.
8. Throughout the period from January 1, 1942, to July 16, 1946, during which period the Army was employing registered longshoremen and clerks through the San Francisco dispatching halls as hereinabove set forth, the Coast Association continued to perform all of the functions which have been mentioned in maintaining and operating the longshoremen’s and clerks’ labor pools (registration lists) and dispatching halls at San Francisco, as well as various other functions in respect thereto necessitated by war conditions, all of which functions were necessarily involved, as the Army knew, in supplying men and insuring their continued availability through the dispatching halls. More particularly:
(a) The Association negotiated amendments and renewals of the longshore and clerks’ contracts providing for the continued maintenance of the registration lists and dispatching halls and fixing the wages, hours, and working conditions at which the services of the longshoremen and clerks were made available through the halls. In this connection, it had negotiated and executed under date of December 20,1940, an amendment and renewal of the longshore contract, the negotiation of which had occupied much of the time of its staff and counsel over a period of 16 months. Also, it had negotiated and executed, acting through the Waterfront Employers Association of San Francisco, the clerks’ contract of November 3,1941. Pursuant to the provisions of the longshore contract, the Coast Association thereafter conducted negotiations and arbitration proceedings which resulted, under date of January 31, 1942, in an arbitration award amending the wage schedules of the longshore contract. These negotiations were protracted and the arbitration proceedings extended over a period of four months, *690 with 22 days spent in hearings. This award was followed by negotiation of a renewed contract relative to clerks. The Association thereafter conducted negotiations and proceedings before the National War Labor Board which resulted, on May 25, 1945, in a panel report and on August 18, 1945, in a Directive Order further amending the wage scales and other provisions of the longshore contract. The Directive Order related, among other things, to registration, dispatching rules, the composition and organization of standard gangs and the dispatching of extra men, the dispatching of unnecessary men, daily reporting at the dispatching hall, redispatching of a man to an employer who has discharged him, the operation of the dispatching hall and the selection of its staff, and the establishment of branch dispatching halls. These negotiations and proceedings extended over a period of approximately a year and included hearings both in San Francisco and in Washington, D. C. Negotiations and proceedings before a panel of the Tenth Regional Labor Board also were had with respect to clerks and resulted in the issuance by the Board of recommendations dated November 13, 1945, and in the execution of a renewed contract under date of March 28,1946. The Association negotiated further agreements dated October 31, 1945, March 18, 1946, and March 19, 1946, further amending the longshore contract.. In the latter part of 1945, and the first half of 1946, the-Association conducted negotiations and proceedings before a fact-finding panel appointed by the President, which negotiations and proceedings resulted in the issuance by the panel of a report dated May 13, 1946, and in the execution under date of June 14,1946, of an agreement retroactive to October 1,1945, further amending the longshore and clerk’s contracts. These negotiations and proceedings took place in San Francisco and in Washington, D. 0.
(b) The Association attended to the maintenance and operation of the dispatching halls for the San Francisco Bay area, did all of the accounting and bookkeeping involved in the operation of the halls, at its own expense, and paid one-half of all other expense of maintaining and operating the halls. The administration of the halls required *691 and received the daily attention of the Association’s staff. In this connection, when the Army’s stevedoring was at its peak, approximately 50 percent of the activities of the halls related to the dispatching of men to the Army.
(c) In connection with the operation of the dispatching halls, the Association handled the allocation of gangs and men. There was a continuous shortage of men during the war and allocation daily among the several employers, including the Army, was necessary. During the war years, American Flag dry cargo vessels calling at the Port of San Francisco were operated either by the Army or the Navy or the War Shipping Administration, the stevedoring work on Navy and War Shipping vessels being done by independent stevedoring contractors who were members of the Association. In carrying out the allocation program each employer, including stevedoring contractors and the Army, informed an Association staff member over the telephone each day of the identity of the ships then being worked by such employer, the number of gangs presently employed on each such ship, the number of such gangs which would be released at the end of the day and the number which would be required to return the next day, the identity of ships which the employer expected to start working that night or the next day and the number of gangs which would be required therefor. The Association staff member then obtained from the dispatching hall the necessary information as to the number of gangs not working. Upon the basis of the information thus obtained, an estimate was then made of the number of gangs which would be available and they were then allocated among the several employers. During the early part of the war, the daily decisions as to how available gangs were to be allocated among the several employers was made by the Association; later the decision was made by an allocations committee, formed at the instance of the Association, upon which the Army and Navy had representation, but the information upon which the decision was based was collected and furnished, as before, by an Association staff member. After the decision was made as to how available gangs were to be allocated among the sev *692 eral employers, the Association staff member then communicated the necessary information and instructions to the dispatching hall.
(d) The Association handled the expansion of the registration lists to provide the large numbers of additional longshoremen and marine clerks required by wartime shipping. In this connection the longshoremen’s registration list was expanded from approximately 4,100 men in December 1941, to approximately 9,000 men in July 1945, which expansion was largely necessitated by the requirements of the Army. In expanding the registered lists it was necessary to recruit men, to process them for the purpose, among others, of excluding aliens of classes barred from waterfront areas by governmental regulation, and to provide means of identification required by Coast Guard regulations and by the Army. The problems involved in expanding the registration list were greatly aggravated by the large labor turnover resulting from operation of the Selective Service Act. Following termination of the war the expanded registration list far exceeded the peacetime needs of the port and the Association was left with the problem of contracting the registration lists to fit the peacetime needs of the port.
(e) The Association supervised the removal from the registration lists of longshoremen and clerks who, without good reason, did not make themselves regularly available for work, or who proved unable or unwilling to do good work, and to the removal, suspension or other disciplining of those guilty of misconduct or deemed otherwise undesirable. The Army, like the Association’s members, submitted complaints regarding such matters to the Association for handling, the complaints being submitted both over the telephone and in writing. Similarly, the Association acted for the employers in dealing with the grievances of the men and of the Union, including their grievances against the Army. In addition to removing, suspending, and disciplining longshoremen and clerks for reasons such as above-mentioned, it was necessary for the Association to screen out and remove from the registration list aliens excluded from time to time from waterfront areas by governmental regulations.
*693 (f) The Association bandied the various problems involved in maintaining the registration lists at strength. It was necessary to process and pass upon applications for leaves of absence by men entering the armed services, as well as by others. In addition, the Association handled all matters relative to occupational deferment of men, and obtained the necessary deferments of key men such as gang bosses, lift jitney drivers, winch drivers and hatchtenders. It was necessary also to provide the required identification and fingerprinting for longshoremen already registered at the beginning of the war, as well as for those thereafter added to the registration list.
(g) The Association supervised the organization of the registered longshoremen, including the large numbers of men added weekly to the registration list, into gangs, and to the selection and appointment of gang bosses, hatchtenders, winch drivers, lift jitney drivers and other key men. As the registration list was expanded, which expansion as already stated was largely necessitated by Army requirements, it was necessary to organize large numbers of new gangs and to select and appoint the gang bosses and other key personnel. Thus the number of organized gangs was increased from 185 in December 1941, to 355 in July 1945, which increase involved the organization of 170 new gangs and the selection, training, and appointment of the key personnel (gang bosses, winch drivers, hatchtenders, and jitney drivers) thereof. The Army also required specially qualified and selected men to load ammunition and other high explosives, and in this connection it was necessary to screen the registration list and to issue special identifying cards to those longshoremen to whom the handling of explosives could safely be entrusted. In meeting these various requirements, it was necessary to intermingle the new and untrained men with the experienced longshoremen in such manner as to provide insofar as possible a trained nucleus for each gang of longshoremen. It also was necessary to fill vacancies occurring in gangs to keep them up to strength. At the end of the war, and with the cessation of the Army’s heavy demands, the Association was left with the necessity of breaking up the surplus gangs.
*694 (b) The Association gave registered longshoremen and clerks continuing instruction in respect to proper safety practices. This instruction was carried on for the most part by the distribution to the men of printed safety rules for various key classifications such as gang bosses and winch drivers, safety rules for longshoremen generally, monthly cards upon which the men might keep their time and which bore various safety slogans and rules, and special cards relative to particular hazards shown by current experience to require special attention; and the Association maintained the accident frequency causation, and other data necessary for the performance of this work.
(i) In performing the foregoing functions, excepting those mentioned in paragraphs (c) and (h), it was necessary for the Association to carry on continuing discussions with the ILWU for the purpose of obtaining agreement to proposed action where such agreement was required by the collective bargaining contract, or cooperation therein. This the Association did in Labor Relations Committee and in conferences and telephone conversations which took place daily.
In addition to performing the foregoing functions involved in maintaining the registration lists and dispatching halls, the Association, in the interest of accident prevention, inspected ships and operating methods when requested to do so. The Army, like Association members, called upon the Association for ship inspections and also called upon the Association for advice and help in formulating and carrying out its own accident prevention program. Until March 1943, the Army had only one safety engineer at San Francisco. In March 1943, it began to build up a staff of assistants. The Army made full use of the Association’s advice, accident frequency, and other data and film library, in training its staff, in formulating its safety rules, and in meeting daily problems.
9. In December 1941, Mr. Frank P. Foisie, President of the Coast Association, and Mr. Gregory Harrison, Counsel for the Association, called upon Lt. Colonel C. H. Kells of the Water Transportation Branch of the Office of the Quartermaster General in Washington, D. C. They told Colonel *695 Kells that the Association wished to be paid for services it was rendering to the Army. Colonel Kells replied that the Army planned to continue doing its own stevedoring work at San Francisco and to obtain longshoremen and clerks through the established hiring halls, and that he would recommend payment for Association services but that he would be obliged to refer the matter to higher authority. Colonel Kells further said it was the purpose of the Army to accomplish the stevedoring of vessels according to the labor agreement in effect at that time. He asked that the Association confirm its request for payment in writing.
After Mr. Foisie’s return to San Francisco, he wrote Colonel Kells two letters, the first dated December 20, 1941, and the second dated January 26,1942, in which he outlined the service performed by the Association in furnishing a supply of longshoremen and requesting payment by the Army of its proportionate share of the expense incurred. The first letter referred to, states in part as follows:
Although we have supplied the Transport Service with longshoremen and ship clerks throughout the years without charge and do not ask for any reimbursement for such service for previous years, now that your demands upon our supply of men are so very large we do ask that you bear the expense from here on and, if you are willing, from January 1,1941.
In his second letter, Mr. Foisie stated that if the Army did not wish to divulge the tonnage of cargo handled at San Francisco, the Association would be willing to accept in lieu of the 2y2 cents per ton paid by its members, the equivalent rate of 2y2 cents per man-hour.
On February 3, 1942, Colonel Kells’ office advised the Association by letter that the matter was being investigated and upon completion of the investigation, a reply would be made.
Following receipt of Mr. Foisie’s letter of December 20, 1941, Colonel Kells transmitted a copy thereof to the Office of Colonel John H. Mellom, Superintendent of the Army Transport Service for the San Francisco Port of Embarkation, with instructions to investigate the matter. Following receipt of these instructions, Major Samuel E. Sax, Adminis *696 trative Assistant to Colonel Mellom, conferred with representatives of the Association. Mr. John Hulen, a civilian auditor employed in the Office of the Superintendent of the San Francisco Port of Embarkation, also conferred with Association representatives concerning the nature, extent and volume of the services rendered to the Army Transport Service.
Representatives of the Army and of the Association had a number of additional conferences in San Francisco. Thereafter on June 10, 1942, a letter was addressed to Colonel Mellom signed by three members of a committee representing the Board of Directors of the Association. The letter states that a number of conferences had been held between representatives of the Army and the Association, discussing the services rendered to the Army Transport Service by the Association, for the purpose of obtaining an agreement from the Army to share in the expense of maintaining the Association’s services from which the Army benefits. It adds that a meeting of its Board of Directors was held to discuss the matter “since such a considerable portion "of Waterfront labor is being used directly by the Army Transport Service that contributions from the other Members are not sufficient to meet the running expenses.” A summary is shown of the number of longshoremen dispatched from the hiring hall to the Army from January 1941, to April 1942, indicating a rise from 38,300 man-hours in January 1941, to 224,600 man-hours in April 1942. A breakdown of the costs of operating the Association in San Francisco was also shown. The concluding paragraph of the letter reads as follows:
The Directors of the above Associations have requested that their Special Committee confer with you, supplementing the information given above with any further detail that you may require, and believe that you will see the fairness of their request that you agree to contribute to the expense of the service which is being maintained in the amount of 1.1 ‡ per ton of cargo handled by the Army Transport Service.
As a result of a reorganization within the Army, the Chief of Transportation, in April 1942, had taken over various functions formerly performed by the Quartermaster *697 General. On July 9,1942, Colonel Mellom wired the Water Division of the Office of the Chief of Transportation as follows:
WATERFRONT EMPLOYERS ASSOCIATION OF SAN FRANCISCO, PROVIDING SERVICE OF STEVEDORE HIRING AND DISPATCHING HALL THROUGH WHICH STEVEDORES ARE DAILY MADE READILY AVAILABLE TO THE ARMY TRANSPORT SERVICE, AND ACCIDENT PREVENTION BUREAU THROUGH WHICH ACCIDENTS OCCURRING IN ARMY TRANSPORT SERVICE OPERATION MAY BE MATERIALLY REDUCED, AND LABOR NEGOTIATIONS SERVICE THROUGH WHICH THE ARMY TRANSPORT SERVICE IS RELIEVED OF THE BURDEN OF NEGOTIATING WAGE SCALES WITH LABOR UNIONS, HAVE REQUESTED THAT ARMY TRANSPORT SERVICE COMPENSATE THEIR NON-PROFIT ORGANIZATION TO THE EXTENT OF ONE CENT SEVEN MILLS PER CARGO TON HANDLED THROUGH THIS PORT OR IF SUCH FIGURES MAY NOT BE RELEASED THEN PER MAN-HOUR WORKED FOR THIS SERVICE, SERVICES RENDERED IN ADDITION TO THE ABOVE INCLUDE PHOTOGRAPHING, FINGERPRINTING, AND INVESTIGATING ALL WATERFRONT EMPLOYEES OF THIS PORT WHICH RESULTED IN THE DESIGNATION AND ELIMINATION OF NUMEROUS UNDESIRABLE ALIENS FROM THE DOCK AREA. THEIR ORIGINAL PROPOSAL WAS CONTAINED IN ENCLOSURE TO YOUR LETTER OF JANUARY 3, 1942, QM 486. T-R AT WHICH TIME CONTRIBUTION REQUESTED WAS 2 Vs CENTS PER TON OR PER MAN-HOUR. REPORT OF AUDIT OF THIS ORGANIZATION AS O.F DECEMBER 31, 1941, RENDED [Sic] BY A REPUTABLE FIRM OF NATIONALLY KNOWN CERTIFIED PUBLIC ACCOUNTANTS, HAS BEEN EXAMINED. WE URGENTLY RECOMMEND YOUR IMMEDIATE TELETYPE APPROVAL OF THE PROPOSAL OF THE WATERFRONT EMPLOYERS ASSOCIATION OF SAN FRANCISCO TO PROVIDE THE ARMY TRANSPORT SERVICE WITH ALL OF THEIR SERVICES, AS OF JANUARY 1, 1942, AT THE QUOTED RATE, AS A SOUND AND ECONOMIC BENEFIT TO THE WAR EFFORT.
The above telegram was followed by a letter of July 22, 1942, signed by Major Sax for Colonel Mellom which, after describing the extent of the services offered by the Association, stated that though members of the Association contribute 2y2 cents per ton of cargo handled or per man-hour performed, since some of the functions performed by the Association were not of particular advantage to the Army, the Association has offered to render all of its services to the Army upon a basis of 1.7 cents per ton handled or per man-hour of stevedore labor performed. Because of the secrecy necessarily surrounding the cargo tonnage of the *698 Army, it was recommended that the rate of 1.7 cents per stevedore man-hour be paid. The concluding paragraph of the above letter is quoted below:
4. It is urgently recommended that your approval of our support of the Waterfront Employer’s Association of San Francisco in the manner outlined above be granted; this support to be effective as of January 1, 1942. This date is recommended for the reason that by its assumption of the major portion of-the operations at this port in the latter part of December, 1941, the Army Transport Service has curtailed the operations of commercial organizations to such an extent that the Association has experienced a continuous loss since the first of this year. This service has received the many advantages afforded by the Association _ and should justly support it. In our considered opinion, this Association renders valuable service to the Army Transport Service and its proposal is just and reasonable in the circumstances.
Thereafter, the Office of the Chief of Transportation asked for and obtained from Major Sax certain additional information relative to the desirability of computing the fro-posed contribution on a man-hour rather than a tonnage basis.
On September 16,1942, Colonel Mellom wired the Chief of Transportation as follows:
REURTEL * * * AUGUST 8 AND OUR LETTER OF REPLY THERETO AUGUST 14, SUBJECT CONTRIBUTIONS TO THE WATERFRONT EMPLOYERS ASSOCIATION, IT IS DEEMED URGENT THAT DECISION BE MADE RELATIVE TO CONTRIBUTIONS AT ONCE. AS EXPRESSED IN OUR PREVIOUS COMMUNICATIONS THE ASSUMPTION BY ARMY TRANSPORT SERVICE OF THE MAJOR ACTIVITIES AT THIS PORT PRECLUDES THE ASSOCIATION FROM OBTAINING ESSENTIAL OPERATING REVENUE FROM ITS REGULAR MEMBERSHIP. WE ARE ADVISED THAT FUNDS OF THE ASSOCIATION ARE REACHING A VERY LOW EBB AND THAT IMMEDIATE ASSISTANCE MUST BE FORTHCOMING IF IT IS TO CONTINUE EFFECTIVE OPERATIONS. IT IS STRONGLY URGED THAT THIS MATTER BE GIVEN PRIORITY DETERMINATION AND THAT AUTHORIZATION FOR CONTRIBUTIONS AS RECOMMENDED IN REFERENCE LETTER ABOVE OF AUGUST 14 BE AUTHORIZED.
General Charles P. Gross, Chief of Transportation, on September 25,1942, wired Colonel Mellom as follows:
*699 REURTEL * * * CONCERNING COMPENSATION WATERFRONT EMPLOYERS ASSOCIATION. UPON YOUR RECOMMENDATION DECISION REACHED THAT PAYMENT SHOULD BE MADE FOR ASSISTANCE RENDERED. HOWEVER BASIS FOR EFFECTING SAME NOT YET FORMULATED BUT BELIEVE SUCH WILL BE AVAILABLE WITHIN WEEK. DO NOT CONSTRUE THIS AS AUTHORITY TO PROCEED UNTIL FURTHER INSTRUCTIONS XXXXXXXXX FORTHCOMING.
On October 15,1942, Colonel Mellom bad received no further word from General Gross; on that date he therefore teletyped the Office of the Chief of Transportation urging approval of the recommended rate of 1.7 cents per man-hour as being the “most expeditious manner of determining contributions.” On October 30,1942, Major Sax wrote the Chief of Transportation stating that the Board of Directors of the Association was to meet in San Francisco on November 11, and asking to be advised prior to that time of “your determination of the method to be used in calculating contributions to be made by the Army Transport Service.” On or about November 11, 1942, Major Sax was advised over the telephone by the Office of the Chief of Transportation, that payment of 1.7 cents per man-hour, commencing as of January 1, 1942, had been approved and that Major Sax was authorized to proceed with the preparation of the necessary contracts, but that the details thereof were to be subject to approval by the Chief of Transportation. Major Sax thereupon relayed this information to Mr. Boyd, Secretary-Treasurer of the Association, who in turn advised the Association’s Board of Directors which was then in session.
Thereafter Major Sax drafted two contracts, one covering the period from January 1, 1942, to June 30, 1942, inclusive, and the other covering the fiscal year commencing July 1, 1942, providing for the payment by the Army to the Association of 1.7 cents per man-hour. These contracts provided that the Association should submit monthly vouchers to the Army setting forth the hours of longshore labor performed on the Army’s behalf, that the Army should make monthly payments to the Association based on these vouchers, and that such payments should be made on the 15th day of the calendar month following the month in which the services were actually rendered. *700 These contracts also provided that they were subject to the written approval of the Chief of Transportation and were not to be binding unless so approved. Major Sax submitted them to the Association with the request that they be executed in triplicate and returned to him. The Association executed the two contracts in triplicate and on December 26, 1942, returned them to Major Sax, who in turn on December 30, 1942, forwarded them to the Chief of Transportation for approval.
Not having heard from the Chief of Transportation, Colonel Mellom, on January 19,1943, teletyped him requesting immediate advice as to the action taken on the contracts. In the meantime, in conferences held by personnel of the Office of the Chief of Transportation, industrial relations personnel had voiced a fear that if the Army were to compensate the Association for its service, the ILWU might object that the Army was thereby contributing to the “war chest of the other side” and that labor difficulties might result. In March 1943, Mr. Foisie and Mr. Harrison were in Washington and met with representatives of the Office of the Chief of Transportation, among whom were Colonel E. M. Hicks, Deputy Chief, Water Division, Office of the Chief of Transportation; Colonel Charles Martin, Chief of the Industrial Eelations and Personnel Division; and Colonel Andrew D. Warwick, who was in charge of stevedoring. Thereafter, during the year 1943, Mr. Foisie and Mr. Harrison had certain further conferences with these and certain other officers in the Office of the Chief of Transportation. In these conferences, the Association representatives stated in substance that they had been repeatedly told that the Association was to be paid and asked the reason for the delay and what could be done to expedite payment. The Army representatives present responded that they had recommended payment, that they expected that the Association would be paid, but that the matter had been sent “upstairs” and still remained there. In one of these conferences, the Army representatives pointed out that there might be some objection from the ILWU and asked if the Association would secure the approval of the ILWU. Mr. Foisie stated that he would consider this matter, but on a later occasion *701 stated that the Association was unwilling to seek ILWU approval. Representatives of the Office of the Chief of Transportation thereafter conferred with Mr. Harry Bridges, President of the ILWU, and asked Mr. Bridges if he would object to the Army’s paying the Association for the Association’s service. Mr. Bridges replied that he would object, and no further action was taken upon the proposed contracts which had been drafted by Major Sax.
During a conference shortly prior to November 1, 1943, Colonel R. M. Hicks, Chief of the Water Division of the Office of the Chief of Transportation, suggested to Mr. Foisie that payment for the Association’s past services might be expedited if the Association were to submit bills therefor to the Port of Embarkation, and, pursuant to this suggestion, Mr. Foisie, under date of November 1, 1943, wrote Colonel Mellom a letter enclosing bills covering the period from January 1942 to September 1943, inclusive, at the rate of 1.7 cents per man-hour. In his letter, Mr. Foisie stated it to be his understanding that the contracts which had been prepared by Major Sax had not been signed by the Army because of an objection raised by Mr. Bridges, President of the ILWU. Mr. Foisie pointed out that notwithstanding the Army’s failure to sign the contract, it was continuing to make use of the Association’s service and that its demands upon the Association had been increasing.
Thereafter in February 1944, Mr. Foisie and Mr. Harrison called upon Edward F. McGrady, Assistant to the Secretary of War, and inquired why the Association was not being paid; Mr. McGrady, who was familiar with the service rendered by the Association, stated that he knew of no reason why the Association should not be paid and said that he would investigate and find out why payment was not being made. When Mr. Foisie again talked with Mr. McGrady, Mr. McGrady stated that he had been through the matter “in the Pentagon Building,” that the Association was entitled to payment, that he saw no reason why payment should not be made forthwith, and that he would make further effort to see what could be done.
Thereafter Mr. Foisie and Mr. Harrison again called at the Pentagon and talked to Colonel Martin and Colonel *702 Warwick, who stated in substance that the matter of payment was deadlocked “upstairs” and that there was nothing further they could do except to repeat their recommendation that payment be made. Colonel Warwick suggested that the Association revive the issue by writing Major General Frederick Gilbreath, Commanding General of the San Francisco Port of Embarkation. Accordingly, on April 26, 1944, Mr. Foisie wrote General Gilbreath, pointing out that all of the services of the Association had been rendered to the Army as though the contracts which had been prepared by Major Sax had been approved by the Chief of Transportation, and asking that the Association be paid for its services from January 1,1942, upon the basis provided in those contracts.
In November 1944, Mr. T. E. Cufie, a vice president of American President Lines, one of the members of the Association, had a talk with Colonel Hicks and, under date of December 4, 1944, wrote Colonel Hicks a letter enclosing a copy of one of the contracts which had been prepared by Major Sax and asking that the matter of payment “be handled to a conclusion at this time.” Under date of December 19, 1944, Colonel Hicks wrote General Gilbreath “By order of the Chief of Transportation” as follows:
1. The attached contract has been submitted to this office so that action may be taken to pay the Waterfront Employers’ Association for various services rendered at the San Francisco Port of Embarkation. It is the opinion of this office that the Association should be paid for the tangible services rendered to the Army, such as the use of hiring halls and the maintenance of payroll and social security records of longshoremen.
2. It is considered as a matter of policy that the Army should not pay for such services as the negotiation, interpretation, and administration of collective bargaining agreements. Certain services, such as safety promotion and accident prevention, appear to be of no direct and tangible benefit to the Army. In view of the fact that the Port is more familiar with the exact nature of the services rendered, it is recommended that your office draft a contract enumerating the services for which the Association is to be paid.
S. Compensation for these services should be fixed on the basis of man-hours of longshore labor or at a fixed fee per month, but not on the basis of cargo tonnage shipped.
*703 4. It is the opinion of the Legal Division, OCT, that payment cannot be made for services rendered in the past. Payments will be made only for services rendered from the time that a contract is signed.
5. As the attached contract was drafted in 1942, the clauses will have to be revised to conform to current procurement regulations and instructions.
6. This contract would be made subject to the approval of the Chief of Transportation, and signed copies should be sent to the Legal Division, OCT, for distribution.
Thereafter, Lt. Colonel W. D. McGraw, who had assumed the position of Director, Industrial Belations Division, San Francisco Port of Embarkation, in December 1944, communicated with Mr. Foisie and thereafter met on certain occasions with Mr. Foisie and other representatives of the Association. He stated that while the Association’s safety and accident prevention work was of value to the Army and was reflected in its operations, the San Francisco Port of Embarkation had a safety division whose responsibility it was to attend to safety matters, and that, in his opinion, the Army could not, in any contract with the Association, take the Association’s safety work into account. He also stated that it would be foreign to the Army’s policy to bear any portion of the cost of negotiating labor contracts with the ILWU. Colonel McGraw asked for and obtained from the Association certain financial and cost data and submitted this data to the Supplies and Facilities Division of the San Francisco Port of Embarkation for analysis and recommendation as to the proper rate of compensation. The Supplies and Facilities Division recommended that payment be made at the rate of $3,150 a month. Colonel McGraw then drafted two proposed contracts, one covering the period from January 1, 1945, through June 30,1945, and the other covering the fiscal year commencing July 1,1945, providing for payment to the Association at the rate of $3,150 a month. This rate of compensation was not the result of negotiations between Colonel McGraw and the Association, but was employed by Colonel McGraw as the result of the above-mentioned recommendation of the Supplies and Facilities Division. Shortly thereafter, Colonel McGraw was required to make a trip to Washington; he took the proposed contracts with him, *704 together with a covering letter dated July 21,1945, and submitted them to the Office of the Chief of Transportation, but they were disapproved. He so advised the Association.
Thereafter, there were certain further conversations between Colonel McGraw and Mr. Foisie. In one of these conversations Colonel McGraw stated that he thought that if the Association could secure approval of the ILWXJ, the Army would pay. Mr. Foisie took this suggestion up with the Association’s Board of Directors, which declined to ask for ILWXJ approval. By letter dated August 9, 1945, Mr. Foisie advised Colonel McGraw as follows:
Confirming our conversation:
It is my understanding, and I so reported to the Directors of this Association, that the Army recognizes its obligation to pay this Association for services rendered, but conditions its payment upon approval by the Union.
The decision of the Directors is that the employers will leave to the Army whether it will make payment for services received in such amounts as the Army determines to be compensatory.
Inasmuch as the employers do not believe that the payment to the Association for services rendered is of any concern to the Union, the employers decline the condition which the Army would impose, namely, that this matter be submitted to the Union for its approval.
The Directors re-affirm their position, taken for the past three years, that whether or not the Army pays for the services received, this Association will continue to render all help in its power.
Thereafter, Mr. Foisie had further conversations with representatives of the Office of the Chief of Transportation and was promised a definite early response one way or the other as to whether or not payment would be made, but no such answer was received.
The Association therefore, on or about April 16,1947, filed with the Army a claim under Section 17 of the Contract Settlement Act of 1944. The claim was for the sum of $410,-332.80, which represented a rate of 2% cents per man-hour for the period from January 1,1942, to July 15,1946, inclusive. Under date of January 5, 1949, an Army Board of Inquiry issued “Findings of Fact” rejecting the Association’s claim *705 upon the grounds (a) that no officials of the San Francisco Port of Embarkation having authority to do so had promised payment or requested the Association’s services under such circumstances as to imply a promise to pay, (b) that the S.an Francisco Port of Embarkation had obtained its longshoremen through the dispatching hall in order to conform to established practices and it could have obtained them through other means just as beneficial, (c) that the materials, services and facilities furnished the San Francisco Port of Embarkation by the Association arose out of cooperation made necessary by the dispatching hall system and that the Association benefited from such cooperation, and (d) that the Association had received sufficient revenue from its members to cover its costs of operation and that the “source of most of its revenue was Government cargoes.”
10. As hereinabove indicated, the San Francisco Port of Embarkation, throughout the period from January 1, 1942, to July 15, 1946, inclusive, placed daily orders for longshoremen and clerks to be dispatched through the San Francisco dispatching halls. It did so knowing that in making the men available, it was necessary for the Association to perform the various functions involved in maintaining the registration lists and dispatching halls which have been outlined in finding 8 above.
11. The San Francisco Port of Embarkation was not authorized to execute a formal contract to pay for the Association’s service except with the approval of the Quartermaster General prior to April 1942, and of the Chief of Transportation thereafter. However, the Quartermaster General and the Chief of Transportation were aware throughout the period in question that the San Francisco Port of Embarkation was obtaining its longshoremen and clerks through the Association dispatching halls and was thereby utilizing the Association’s service as hereinabove set forth, and that the Association was demanding compensation therefor, and they acquiesced in, approved, and authorized the conduct of the San Francisco Port of Embarkation in so utilizing the Association’s services. Furthermore, the Chief of Transportation was responsible for the assurance given to the Association on September 25, 1942, and on *706 November 11, 1942, that it would be compensated for the services rendered.
12¿ The Association rendered valuable service to the defendant at the defendant’s request, and with the expectation that it would be paid therefor, during the period from January 1, 1942, to July 15, 1946, inclusive.
13. (a) Throughout the period from January 1, 1942, to July 15, 1946, and for some time prior thereto, the Association’s regular and established charge for its service in the case of its members was 2% cents per manifest ton, and in the case of nonmembers was 4 cents per man-hour for longshoremen, and 2% cents per man-hour for clerks. As heretofore indicated, the Army’s stevedoring during the period in question at ports other than San Francisco, and a small amount of its stevedoring at San Francisco, was done by stevedoring contractors who were members of the Association. The Army’s contracts with these stevedoring contractors provided for compensation of the contractors at specified rates per ton of cargo loaded or discharged, these rates (hereinafter called commodity rates) varying with different commodities. In computing the commodity rates, which were revised from time to time to conform to experience, the contractors were specifically allowed 2% cents per manifest ton to cover the Association’s charge for its service as an item of cost. When the Association, in December 1941 asked that it be compensated for its service in San Francisco, it asked that it be paid at the rate of 2% cents per manifest ton, the same rate paid by its members, but offered in the alternative to accept 2*4 cents per longshore man-hour if the Army should be reluctant to reveal its tonnage. The latter offer was made upon the assumption that the longshoremen would handle approximately one ton per man-hour and that a rate of 2y2 cents per man-hour therefore was the approximate equivalent of a rate of 214 cents per manifest ton.
(b) During the period from January 1, 1942, to July 15, 1946, the Army utilized a total of 16,413,312 longshore man-hours in its direct hire operations. During the period from October 1,1942, to July 15,1946, the Army utilized 14,712,501 longshore man-hours in its direct hire operations. The exact manifest tonnage handled does not appear, but the *707 measurement tonnage amounted to 20,242,028 measurement tons and the manifest tonnage amounted to at least as much; in this connection, Army experience under stevedoring contracts indicated that the average ratio of manifest tons to measurement tons was 109 to 100, upon which basis the manifest tonnage amounted to 22,063,810 tons. If the Association were to be compensated by the Army on the same basis as it was compensated by other nonmember employers (i. e., at a rate of 4 cents per man-hour for longshoremen), the amount owing, computed on the basis of 16,413,312 man-hours, would be something in excess of $650,000. If the Association were to be compensated by the Army on the same basis as it was compensated by its members (i. e., at a rate of 2% cents per manifest ton), the amount owing would be in the neighborhood of $551,000. Compensation at the rate of 2y2 cents per longshore man-hour would amount to $410,332.80, the amount prayed in the petitions.
(c) In 1942, as hereinabove noted, the Army and the Association reached agreement upon a rate of 1.7 cents per long-shore man-hour, subject, however, to approval of the Chief of Transportation of the terms of the contract in which the rate was to be incorporated. This rate was based upon a computation which showed that the Association’s expense at San Francisco during the year 1941 had amounted to 1.7 cents per ton, and upon the assumption that longshoremen on the average handled one ton per man-hour and that a rate of 1.7 cents per man-hour therefore would be the equivalent of a rate of 1.7 cents per ton. The rate thus arrived at was designed to reimburse the Association for the Army’s proportion of the Association’s current operating expense.
If the Association had been compensated by the Army for the period from October 1, 1942, through July 15, 1946, at the rate of 1.7 cents per longshore man-hour, plaintiff would have received $250,112.52.
(d) The Army obtained its men through the hall with full knowledge of the fact that the Association continuously instructed and indoctrinated the men in proper safety practices and that, in view of the rotational nature of the employment, there was no way in which the Association could segregate men working for the Army and confine its safety education *708 to others. The Army benefited from the Association’s work in educating the men in proper safety practices just as did Association members, and also had the benefit of the Association’s advice and aid, which it specifically requested, in formulating and carrying out its own accident prevention program, all as hereinabove noted. Except for the special service rendered the Army in inspecting ships and formulating and carrying out the Army’s accident prevention program, the various functions performed by the Association as here-inabove enumerated all were necessary to the maintenance of the dispatching halls and of pools of competent longshoremen and clerks, and the Army, in utilizing the men, derived substantially the same benefit therefrom as did Association members.
•' 14. The finding of the Army Board of Inquiry that the San Francisco Port of Embarkation furnished information, assistance and services to the Association which were equal in value to, and cancelled out, the information, assistance and services furnished the San-Francisco Port of Embarkation by the Association, is contrary to the evidence in the instant proceeding and is untrue. The San Francisco Port of Embarkation did not render any assistance or service to the Association. The only information supplied by the San Francisco Port of Embarkation to the Association was such information as was necessary to enable the Association to perform its functions, as, for example, information as to the number of gangs required by the Army so that the Association might tend to the necessary allocations, and information as to misconduct upon the part of the men so that the Association might take disciplinary or other appropriate action with respect thereto and might attend to removal of undesirable men from the registration list. Such information was supplied by the Port of Embarkation, just as it was supplied by other employers, so that the Association might properly perform its functions in serving the several employers, including the Port of Embarkation, utilizing the dispatching hall. Such information was neither supplied by the Port of Embarkation nor received by the Association with any thought or intent that the Army should be compensated therefor or that the information should constitute *709 payment' for the service rendered by the Association to the Port of Embarkation. '
15. Plaintiff is the sole owner of the claim against defendant and is the sole party interested therein. No assignment or transfer of the claim or of any part of it or any interest in it has ever been made except by operation of law as here-inabove set forth. On October 22, 1948, Waterfront Employers Association of California purported to assign any interest that it might have in the claim to Waterfront Employers Association of the Pacific Coast, but Waterfront Employers Association of California in fact had no interest in the claim since it and its predecessor Waterfront Employers Association of San Francisco had acted in respect to the matters hereinabove set forth simply as agents of the Coast Association and at-Coast Association expense, all as hereinabove set forth.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States two hundred fifty thousand one hundred twelve dollars and fifty-two cents ($250,112.52).

 The Waterfront Employers Association of California was formed on November 1, 1943, by the consolidation of the Waterfront Employers Association of San Francisco and the Waterfront Employers Association of Southern California.

 First, the International Longshoreman’s Association, an American Federation of Labor affiliate, and then the International Longshoremen and Ware-housemen’s Union, an affiliate of the Congress of Industrial Organizations.